In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 18-2847 & 18-3310

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellee,*

*v.*

CREDIT BUREAU CENTER, LLC,
and MICHAEL BROWN,

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17 C 194 — **Matthew F. Kennelly**, *Judge.*

———————————

ARGUED APRIL 17, 2019 — DECIDED AUGUST 21, 2019

———————————

Before MANION, SYKES, and BRENNAN, *Circuit Judges.*

SYKES, *Circuit Judge.* Michael Brown is the sole owner and operator of Credit Bureau Center, a credit-monitoring service. (We refer to both collectively as "Brown.") Brown's websites used what's known as a "negative option feature" to attract customers. The websites offered a "free credit report and score" while obscuring a key detail in much smaller text: that applying for this "free" information auto-

matically enrolled customers in an unspecified $29.94 monthly "membership" subscription. The subscription was for Brown's credit-monitoring service, but customers learned this information only when he sent them a letter *after* they were automatically enrolled. Brown's most successful contractor capitalized on the confusion by posting Craigslist advertisements for fake rental properties and telling applicants to get a "free" credit score from Brown's websites.

The Federal Trade Commission eventually took notice. It sued Brown under section 13(b) of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 53(b), alleging that the websites and referral system violated several consumer-protection statutes. The Commission sought a permanent injunction and restitution. Relevant here, the district judge found that Brown was a principal for his contractor's fraudulent scheme and that the websites failed to meet certain disclosure requirements in the Restore Online Shopper Confidence Act ("ROSCA"). *Id.* § 8403. The judge entered a permanent injunction and ordered Brown to pay more than $5 million in restitution to the Commission.

Brown now concedes liability as a principal for his contractor's Craigslist scam. And he doesn't dispute that his own websites failed to meet some of ROSCA's disclosure requirements. So we have no trouble affirming the judge's decision to hold him liable for both. We also affirm the issuance of a permanent injunction. Brown's argument there rests on an erroneous understanding of the Eighth Amendment's Excessive Fines Clause.

But the restitution award is a different matter. By its terms, section 13(b) authorizes only restraining orders and injunctions. But the Commission has long viewed it as also

authorizing awards of restitution. We endorsed that starkly atextual interpretation three decades ago in *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 571 (7th Cir. 1989). Since *Amy Travel*, the Supreme Court has clarified that courts must consider whether an implied equitable remedy is compatible with a statute's express remedial scheme. *See Meghrig v. KFC W., Inc.*, 516 U.S. 479, 487–88 (1996). And it has specifically instructed us not to assume that a statute with "elaborate enforcement provisions" implicitly authorizes other remedies. *Id.* at 487.

Applying *Meghrig*'s instructions, we conclude that section 13(b)'s grant of authority to order injunctive relief does not implicitly authorize an award of restitution. Every reason *Meghrig* gave for not finding an implied monetary remedy applies here. Most notably, the FTCA has two detailed remedial provisions that expressly authorize restitution *if* the Commission follows certain procedures. Our current reading of section 13(b) allows the Commission to circumvent these elaborate enforcement provisions and seek restitution directly through an implied remedy.

Stare decisis cannot justify adherence to an approach that Supreme Court precedent forecloses. Accordingly, we overrule *Amy Travel* and hold that section 13(b) does not authorize restitutionary relief.[1] Because the Commission brought this case under section 13(b), we vacate the restitution award.

---

[1] Because this opinion overrules circuit precedent and creates a circuit split, we circulated it under Circuit Rule 40(e) to all judges in active service. A majority did not favor rehearing en banc.

**I. Background**

In January 2014 Brown contracted with Danny Pierce to direct customers to his credit-monitoring service. Brown gave Pierce several functionally identical websites with names like "eFreeScore.com" and "FreeCreditNation.com" to use for referrals. As their names suggest, these websites invited people to sign up for a "free credit report and score." But signing up for the free score also automatically enrolled applicants in Brown's credit-monitoring service, which charged a monthly subscription fee.

Brown didn't tell prospective customers about the credit-monitoring service. His websites almost entirely focused on the free credit score and report. Three disclaimers, buried in much smaller font, told consumers that applying for the free offer also enrolled them in an unspecified "membership" subscription that cost $29.94 each month. Customers later learned that this subscription was for credit monitoring when Brown sent them a letter after the automatic enrollment.

Pierce did nothing to clear up this confusion. Indeed, it's undisputed that his method for drumming up referrals was fraudulent. He subcontracted with Andrew Lloyd, who posted Craigslist advertisements for nonexistent rental properties at bargain prices. Lloyd invited prospective tenants to email the landlord. Posing as the "landlord," he then responded and instructed them to obtain a credit report and score through one of Brown's websites. But once applicants got this "free" information—and were automatically enrolled in the credit-monitoring service—Lloyd stopped replying to emails.

The plan was effective. Pierce quickly became Brown's most successful recruiter. Over the course of their relationship, Pierce referred more than 2.7 million customers to Brown, generating just over $6.8 million in revenue. Unsuspecting customers were understandably upset. They flooded Brown's customer-service operators, questioning the monthly subscription charge. They complained that the Craigslist advertisements were scams. And many were blindsided by the fact that requesting a free credit score automatically enrolled them in a costly credit-monitoring service. Brown told his customer-service team to deny any involvement with Pierce's operation. And although Brown typically agreed to cancel future charges, he often refused to issue refunds. He also instructed his representatives to offer reduced prices to retain customers. Some customers accepted the offer, but others told their credit-card companies to cancel Brown's charges. Credit-card companies cancelled more than 10,000 of Brown's charges.

Consumers complained to the Commission, which opened an investigation. In January 2017 it sued Brown under section 13(b) of the FTCA seeking an injunction and restitution. The Commission alleged that the Craigslist advertisements violated the FTCA's prohibition on "unfair or deceptive acts or practices." 15 U.S.C. § 45(a). The suit also alleged that Brown's websites violated the same provision of the FTCA, as well as ROSCA, *id.* § 8403; the Fair Credit Reporting Act ("FCRA"), *id.* § 1681j(g); and the Free Credit Reports Rule, 12 C.F.R. §§ 1022.130–.138.

On the Commission's motion, the judge issued a temporary injunction, froze Brown's assets, and appointed a receiver to manage his company. Brown and the Commission

later filed cross-motions for summary judgment. In addition to contesting liability, Brown argued that section 13(b) doesn't authorize an award of restitution and, alternatively, that it doesn't authorize penalties or *legal* restitution (as opposed to *equitable* restitution, which requires tracing a plaintiff's entitlement to a particular account or fund).

The judge ruled for the Commission across the board, holding that Brown violated the FTCA as a principal for the Craigslist scheme and that the websites violated the FTCA, ROSCA, the FCRA, and the Free Credit Reports Rule. The judge issued a permanent injunction that imposed extensive conditions on Brown's continued involvement in the credit-monitoring industry and ordered Brown to pay $5,260,671.36 in restitution. He also denied Brown's motion to unfreeze funds to pay his attorneys.

## II. Discussion

Brown contests his liability, the permanent injunction, and the restitution award. Different standards of review apply. For liability, we review the summary judgment de novo, viewing the evidence in the light most favorable to Brown and drawing reasonable inferences in his favor. *Holloway v. Soo Line R.R. Co.*, 916 F.3d 641, 643 (7th Cir. 2019). We review the judge's decision to enter a permanent injunction for abuse of discretion. *SEC v. Yang*, 795 F.3d 674, 681 (7th Cir. 2015). Finally, Brown's challenge to the restitution award raises legal questions, which we review de novo. *Breneisen v. Motorola, Inc.*, 656 F.3d 701, 704 (7th Cir. 2011).

### A. Liability Issues

The Commission sued under section 13(b) of the FTCA, which by its terms authorizes temporary restraining orders

and permanent injunctions to enjoin violations of federal trade law. § 53(b)(1). To impose individual liability on the basis of a corporate practice, the Commission must prove (1) that the practice violated the FTCA; (2) that the individual "either participated directly in the deceptive acts or practices or had authority to control them"; and (3) that the individual "knew or should have known about the deceptive practices." *FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005).

Based on the summary-judgment record, the judge held that Brown violated the FTCA as a principal for the Craigslist marketing scheme contrived by Pierce and Lloyd. He also held that Brown's websites violated the FTCA, ROSCA, the FCRA, and the Free Credit Reports Rule. Finally, the judge concluded that Brown was individually liable for the violations because he owned and operated all aspects of his company.

While Brown concedes liability for the Craigslist scheme, he challenges his liability for the website violations. He asserts that his websites contained no misrepresentations in violation of the FTCA and satisfied ROSCA's disclosure requirements. He also argues that the Commission must enforce the FCRA and the Free Credit Reports Rule through an internal adjudication. *See* 15 U.S.C. § 1681s(a)(1) (stating that FCRA violations "shall be subject to enforcement by the Federal Trade Commission under section 5(b) of the Federal Trade Commission Act").

It's unnecessary to consider every theory of liability. Brown's challenges to the injunction and restitution award do not turn on which statute his websites violated. And section 13(b) permits the Commission to seek relief against

Brown for violating "any provision of law" it enforces. § 53(b).

So we start and end with ROSCA, which restricts the use of a "negative option feature" to sell goods or services on the Internet. § 8403. A negative-option feature is "a provision [in an offer] under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w); *see also* § 8403 (incorporating this definition by reference). ROSCA prohibits this feature unless the seller "(1) provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (2) obtains a consumer's express informed consent before charging the consumer … ; and (3) provides simple mechanisms for a consumer to stop recurring charges." § 8403. ROSCA violations are "unfair or deceptive acts or practices" under the FTCA, so the Commission can use the FTCA's enforcement regime against violators. *Id.* § 8404.

There's no dispute that Brown used a negative-option feature to enroll customers in his credit-monitoring service. The only question is whether he complied with ROSCA's disclosure requirements. In the apt words of the district judge, Brown's websites were "virtually devoid of *any* mention of the [credit-monitoring] service aside from the statement that the customer is to be billed for it." Moreover, Brown concealed this incomplete disclosure behind more prominent language offering a free credit score and report. The judge determined that these partial and obscure disclosures did not "clearly and conspicuously disclose[] all

material terms of the transaction" or ensure that customers gave "express informed consent." § 8403(1)–(2).

Brown focuses on the conclusion that the disclosures weren't conspicuous. He parses font sizes, details his websites' color schemes, and takes a microscope to the Commission's affidavits in an effort to highlight evidence that consumers read and understood the disclosures. But he gives only passing attention to the decisive point: His websites didn't provide certain information that ROSCA requires—namely, that the subscription was for a credit-monitoring service.

This oversight is fatal to Brown's defense. Setting aside whether his disclosures satisfied the "clear and conspicuous" standard (and on that point we see nothing unsound in the judge's ruling that they did not), Brown violated ROSCA if the disclosures failed to provide "all material terms of the transaction." § 8403(1). The service Brown provided in exchange for the subscription is clearly a material term. *See Material Term*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("A contractual provision dealing with a significant issue such as subject matter … or the work to be done."). And the websites did not tell consumers that they were enrolling in a credit-monitoring service. Brown seeks refuge in the form letter that he delivered to new subscribers, which did provide this information. But ROSCA required Brown to disclose the material terms "before obtaining the consumer's billing information." § 8403. Brown protests that he sent the letter "almost instantaneously" upon subscription. But almost instantaneously is still too late under ROSCA.

Brown next contends that even if corporate liability is established, he should not be held personally liable. But it's

undisputed that he controlled the websites and was aware of their content. That's enough to establish personal liability for the ROSCA violations.

## B. The Permanent Injunction

The judge held that Brown's conduct warranted a permanent injunction, applying our standard under the Securities and Exchange Act. *See Yang*, 795 F.3d at 681 (asking whether "there is a reasonable likelihood of future violations in order to obtain [injunctive] relief") (quotation marks omitted). The ensuing injunction imposes extensive requirements on Brown if he ever operates a credit-monitoring business again.

We don't need to decide whether our standard for an injunction under the Securities and Exchange Act also applies to section 13(b) because Brown's challenge doesn't turn on that question. His attack on the injunction rests largely on the Excessive Fines Clause. U.S. CONST. amend. VIII. He contends that the injunction is unconstitutionally harsh and disproportionate. But he skips a necessary step in the analysis—whether the injunction is a "fine" at all. It's not. The Supreme Court has limited "fines" to "cash [or] in-kind payment[s] imposed by and payable to the government." *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 136 n.6 (2002) (quotation marks omitted); *see also Zamora-Mallari v. Mukasey*, 514 F.3d 679, 695 (7th Cir. 2008) ("The Board's removal order … is not a 'fine,' and thus the Excessive Fine Clause of the Eighth Amendment does not apply."). Because an injunction isn't a fine, the permanent injunction doesn't implicate the Excessive Fines Clause.

Brown also offers an assortment of drive-by arguments, all of which are too undeveloped to establish an abuse of discretion. *See Roger Whitmore's Auto. Serv., Inc. v. Lake County*, 424 F.3d 659, 664 n.2 (7th Cir. 2005) ("It is the parties' duty to package, present, and support their arguments … ."). We affirm the permanent injunction.

## C. The Restitution Award

The bulk of Brown's appeal challenges the restitution order. His primary argument is that section 13(b) does not authorize an award of restitution. This is fundamentally a question of statutory interpretation, but it's obscured by layers of caselaw, so bear with us while we untangle the knot. A brief overview of the FTCA's remedial structure is helpful to a proper understanding of section 13(b), so we begin there.

The FTCA gives the Commission several tools to enforce the Act's prohibition on unfair or deceptive trade practices. Under its "cease and desist" power, the Commission adjudicates a case before an administrative law judge, who can issue an order prohibiting the respondent from engaging in the illegal conduct at issue. *See* 15 U.S.C. § 45(b). This order becomes final if it survives administrative appeal and judicial review. *Id.* § 45(g).

A final cease-and-desist order empowers the Commission to sue the violator for legal and equitable relief, but only if "a reasonable man would have known under the circumstances [that the conduct] was dishonest or fraudulent." *Id.* § 57b(a)(2), (b). After it becomes final, the order also draws a line in the sand for both the respondent and anyone else who engages in the prohibited conduct. If the respondent

later violates the order, the Commission can sue for civil penalties and any equitable relief "the court finds necessary." *Id.* § 45(*l*). If anyone else engages in the prohibited conduct after the order becomes final, the Commission can seek civil penalties if it can prove that the violator acted with "actual knowledge" that his conduct was unlawful. *Id.* § 45(m)(1)(B).

The Commission has two other enforcement mechanisms at its disposal. First, it can promulgate rules that "define with specificity acts or practices which are unfair or deceptive." *Id.* § 57a(a)(1)(B). By preemptively resolving whether certain conduct violates the FTCA, rulemaking permits the Commission to pursue "quick enforcement" actions against violators. Nicholas R. Parrillo, *Federal Agency Guidance and the Power to Bind: An Empirical Study of Agencies and Industries*, 36 YALE J. ON REG. 165, 225–26 (2019). Once the Commission promulgates a rule, it can seek legal and equitable remedies, including restitution, from violators. *See* 15 U.S.C. § 57b(a)(1), (b). And if it establishes that a violator had "actual knowledge or knowledge fairly implied on the basis of objective circumstances" that his conduct violated a rule, the Commission can also pursue civil penalties. *Id.* § 45(m)(1)(A).

The Commission's remaining enforcement mechanism is different. Under section 13(b) of the FTCA, the Commission can forego any administrative adjudication or rulemaking and directly pursue a temporary restraining order and a preliminary or permanent injunction in federal court. § 53(b). As noted, the Commission sued Brown under this provision.

**1.** *Section 13(b)*

The restitution order against Brown rests on section 13(b)'s permanent-injunction provision, which states that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." *Id.* Brown's straightforward argument is that section 13(b) doesn't authorize restitution because it doesn't mention restitution.

We start with the obvious: Restitution isn't an injunction. "Injunction" is of course a broad term. *See Injunction*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("A court order commanding or preventing an action."). But statutory authorizations for injunctions don't encompass other discrete forms of equitable relief like restitution. *See, e.g.*, *Meghrig*, 516 U.S. at 484 ("[N]either [a mandatory or prohibitory injunction] contemplates … equitable restitution.") (quotation marks omitted); *Owner-Operator Indep. Drivers Ass'n v. Landstar Sys., Inc.*, 622 F.3d 1307, 1324 (11th Cir. 2010) ("Injunctive relief constitutes a distinct type of equitable relief; it is not an umbrella term that encompasses restitution or disgorgement."); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 365 (2011) (holding that an equitable order for backpay isn't an injunction); *Nken v. Holder*, 556 U.S. 418, 430 (2009) ("Whether [a deportation stay] might technically be called an injunction is beside the point; that is not the label by which it is generally known.").

The Commission doesn't seriously argue otherwise. It instead contends that section 13(b) *implicitly* authorizes restitution. We endorsed that reading in *Amy Travel*, 875 F.2d at 571, which Brown asks us to overturn. We'll discuss *Amy Travel* in a moment, but we begin with a closer look at the FTCA

itself. If the Commission's reading is correct, there's no need to reconsider our precedent.

Section 13(b) provides:

> Whenever the Commission has reason to believe--
>
> (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and
>
> (2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public--
>
> the Commission … may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: *Provided, however,* That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dis-

> solved by the court and be of no further force and effect: *Provided further*, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction. …

An implied restitution remedy doesn't sit comfortably with the text of section 13(b). Consider its requirement that the defendant must be "violating" or "about to violate" the law. Requiring ongoing or imminent harm matches the forward-facing nature of injunctions. *See* 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2942, at 47 (3d ed. 2013) ("[I]njunctive relief looks to the future and is designed to deter … ."). Conversely, restitution is a remedy for past actions. *See* 1 DAN. B. DOBBS, LAW OF REMEDIES § 4.1(1), at 551 (2d ed. 1993) ("Restitution is a return or restoration of what the defendant has gained in a transaction."). Beyond the conceptual tension, this requirement raises an illogical implication: It would condition the Commission's ability to secure restitution for past conduct on the existence of ongoing or imminent unlawful conduct.

Section 13(b)'s second requirement—that the Commission must reasonably believe that enjoining an ongoing or imminent violation would be in the public interest—raises a similar problem. The public interest in stopping or preventing a violation is distinct from the public interest in remedying a past harm. And yet the Commission's reading ties restitution to this inapposite inquiry.

The rest of section 13(b) is likewise keyed to injunctions, not other forms of equitable relief. For example, the statute conditions the district court's authority to issue a temporary restraining order or preliminary injunction on injunction-

specific requirements—such as "weighing the equities and considering the Commission's likelihood of ultimate success"—and dissolves the order or injunction within 20 days if the Commission doesn't issue an administrative complaint. § 53(b). These demands don't apply to equitable restitution, which has its own preconditions. *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212–15 (2002).

True, this appeal concerns section 13(b)'s permanent-injunction provision, not the provision governing temporary restraining orders and preliminary injunctions, which is tied to the subsequent initiation of an administrative proceeding. And we have held that at least some of section 13(b)'s requirements don't apply to permanent injunctions. *See United States v. JS & A Grp.*, 716 F.2d 451, 456–57 (7th Cir. 1983) (holding that the Commission can seek a permanent injunction without initiating an internal adjudication). *But see FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019) (requiring the Commission to allege an ongoing or imminent violation to receive a permanent injunction). But that's beside the point. Even if some of section 13(b)'s requirements do not apply to permanent injunctions, they inform the meaning of "injunction." We see no contextual support for giving vastly different meanings to section 13(b)'s two uses of the word "injunction." *See Hall v. United States*, 566 U.S. 506, 519 (2012) ("At bottom, identical words and phrases within the same statute should normally be given the same meaning.") (quotation marks omitted). And in any event, we haven't drawn an interpretive distinction in the past. *See FTC v. Elders Grain, Inc.*, 868 F.2d 901, 907 (7th Cir. 1989) (holding that section 13(b)'s preliminary-injunction provision also authorizes implied equitable relief).

The FTCA's two other enforcement provisions amplify the poor fit between section 13(b) and restitution. Both use more than the word "injunction" to authorize other forms of equitable relief. As discussed, when a person violates a final cease-and-desist order, the district courts are empowered to "grant mandatory injunctions *and such other and further equitable relief as they deem appropriate*." § 45(*l*) (emphasis added). And when someone engages in conduct prohibited by a rule, the FTCA authorizes "such relief as the court finds necessary … , [including] *the refund of money or return of property*." § 57b(b) (emphasis added).

The absence of similar language in section 13(b) is conspicuous. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken*, 556 U.S. at 430 (quotation marks omitted). This instruction applies with particular force here, where Congress simultaneously expanded § 45(*l*) to allow for "other and further equitable relief" and enacted section 13(b) without this language. *See* Trans-Alaska Pipeline Authorization Act, Pub. L. No. 93-153, § 408, 87 Stat. 576, 591 (1973). Moreover, Congress expressly approved restitution as a remedy under § 57b(b) two years after enacting section 13(b). *See* Magnuson-Moss Warranty Act, Pub. L. No. 93-637, § 206, 88 Stat. 2183, 2202 (1975). If section 13(b) permitted restitution as a general matter, Congress would have had no reason to enact § 57b, which authorizes restitution under narrower circumstances.

Remedial scope isn't the only difference between section 13(b) and the FTCA's other enforcement mechanisms. The

latter procedures also impose a detailed framework that the Commission must follow before obtaining a restitution order. This framework counterbalances the FTCA's amorphous "unfair or deceptive practices" standard by requiring the Commission to give defendants fair notice, either through cease-and-desist orders or rules that "define with specificity" prohibited acts. §§ 45(b); 57a(a)(1). The Commission can bypass these notice requirements only if it obtains a cease-and-desist order against a violator, brings a suit in court, and then establishes that the prohibited practice "is one which a reasonable man would have known under the circumstances was dishonest or fraudulent." § 57b(a)(2). Finally, the FTCA imposes a three-year statute of limitations on bringing actions against most violators. § 57b(d).

Section 13(b) doesn't offer any of these protections. And yet the Commission contends that it provides an unqualified right to the very remedies that the FTCA's other enforcement provisions give with heavy qualification. Reading an implied restitution remedy into section 13(b) makes these other provisions largely pointless. Without a clear textual signal, we cannot presume that Congress implicitly made such a consequential shift in policy. *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) ("Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions … .").

The tensions we've just discussed dissipate if we read section 13(b) to mean what it says: The remedy is limited to injunctive relief. In fact, giving section 13(b) its plain meaning harmonizes the three enforcement mechanisms. The FTCA gives the Commission a pair of backward-facing methods to obtain monetary relief for past injury. Its cease-

and-desist power targets individual violations. *See* § 45(b). And its rule-enforcement authority under § 57b(a)(1) allows it to more efficiently address widespread unfair or deceptive practices. *See* Parrillo, *supra*, at 225–26.

Section 13(b) serves a different, forward-facing role: enjoining ongoing and imminent future violations. This authority aligns with the predicate requirements it imposes—notably, a reasonable belief that a violation is ongoing or imminent and that stopping the violation is in the public interest. § 53(b). It also explains the lack of procedural protections. As Congress reported when enacting section 13(b), the Commission's existing enforcement processes couldn't quickly address ongoing or imminent violations. *See* § 408(a)(1), 87 Stat. 576, 591 (finding that the Commission had "been restricted and hampered because of inadequate legal authority … to seek preliminary injunctive relief to *avoid* unfair competitive practices") (emphasis added). Section 13(b) corrected this problem, providing an expedited pathway to injunctive relief. *See id*. § 408(b) (noting that the "purpose of [the] act" was to give the Commission "the requisite authority to insure *prompt* enforcement of the laws [it] administers by granting statutory authority … to seek preliminary injunctive relief") (emphasis added).

The Commission's argument to the contrary rests almost entirely on the saving clause in § 57b(e): "Remedies provided in this section are in addition to, and not in lieu of, any other remedy or right of action provided by State or Federal law. Nothing in this section shall be construed to affect any authority of the Commission under any other provision of law." According to the Commission, § 57b(e) explains away

the tensions that its reading of section 13(b) otherwise creates.

We disagree for two reasons. To start, the Commission's understanding of the saving clause runs against more than a century of interpretive practice. The Supreme Court has long instructed that acts "cannot be held to destroy [themselves]" through saving clauses. *Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 446 (1907); *accord Adams Express Co. v. Croninger*, 226 U.S. 491, 507 (1913); *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 299 (1976); *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 228 (1998). Put differently, we cannot read a saving clause to "allow specific provisions of the statute that contains it to be nullified." *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 618 (7th Cir. 1998). This principle extends to claims that a particular statutory provision implicitly authorizes new remedies. *See Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15–16 (1981) ("It is doubtful that the phrase 'any statute' [in a saving clause] includes the very statute in which this statement was contained."). As we've explained, the Commission's reading of section 13(b) effectively nullifies § 57b. We cannot read § 57b(e) to authorize that self-defeating effect.

And even if the Commission's reading of the saving clause were correct, we couldn't infer a right to restitution in section 13(b). The saving clause preserves only those remedies that exist. It does not inform the question whether section 13(b) contains an implied power to award restitution.

The Commission also suggests that Congress "ratified" an implied section 13(b) restitution remedy in its 1993 and 2006 amendments to the FTCA. We disagree. The 1993 amendment reworked section 13(b)'s venue and service-of-

process provisions but didn't alter its remedial scope. The 2006 amendment fares no better as a prop for the Commission's argument. It simply empowered the Commission to use "[a]ll remedies available to [it] with respect to unfair and deceptive acts or practices … , including restitution," when prosecuting certain violations in foreign commerce. § 45(a)(4)(B). The Commission contends that the use of "restitution" in this provision refers to an implied restitution remedy in section 13(b). But the FTCA expressly authorizes restitution through § 45(*l*) and § 57b(b). So the 2006 amendment says nothing about the Commission's authority to seek that remedy under section 13(b).

In short, nothing in the text or structure of the FTCA supports an implied right to restitution in section 13(b), which by its terms authorizes only injunctions. Unsurprisingly, the Commission wagers nearly all of its case on stare decisis rather than the plain meaning of section 13(b). So we turn to that question.

### 2. *The Road to* **Amy Travel**

The Commission correctly observes that we addressed a materially identical challenge to the scope of section 13(b) in *Amy Travel*, 875 F.2d 564. Brown in turn invites us to revisit that decision in light of intervening Supreme Court decisions. We of course can do so. "Although we must give considerable weight to our prior decisions, we are not bound by them absolutely and may overturn circuit precedent for compelling reasons." *Russ v. Watts*, 414 F.3d 783, 788 (7th Cir. 2005). An intervening Supreme Court decision that displaces the rationale of our precedent is one such reason. *See Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 915 (7th Cir. 2009).

Brown's invitation implicates a line of Supreme Court precedents long predating *Amy Travel*. The prevailing interpretation of section 13(b) developed in the shadow of two decisions that took a capacious view of implied remedies: *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946), and *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288 (1960). To understand *Amy Travel*, we must begin with them.

*Porter* considered section 205(a) of the Emergency Price Control Act of 1942, which limited the rent that certain landlords could collect from their tenants. The act empowered district courts to issue a "permanent or temporary injunction, restraining order, or other order" against persons who collect rents above its limits. *Porter*, 328 U.S. at 397. The Court held that section 205(a) authorizes restitution, offering this reasoning:

> Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of [its equitable] jurisdiction. … Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.

*Id.* at 398 (citations and quotation marks omitted).

*Porter* later clarified that implied remedies must be "consistent with the statutory language and policy, the legislative background and the public interest." *Id.* at 403; *see also id.* at

400 ("In framing such remedies under § 205(a), courts must act primarily to effectuate the policy of the Emergency Price Control Act and to protect the public interest while giving necessary respect to the private interests involved."). In short, *Porter* adopted a presumption in favor of implying equitable remedies that accord with statutory purpose. But it also recognized that an express statement or a "necessary and inescapable inference" to the contrary could rebut this presumption. *Id.* at 398.

Returning to the Price Control Act, the Court held that restitution was a proper "other order" under section 205(a). *Id.* at 399. It offered two justifications. First, restitution could be an "equitable adjunct to an injunction." *Id*. Second, restitution advanced the purpose of the statute. *See id*. at 400 ("[T]he statutory policy of preventing inflation is plainly advanced if prices or rents which have been collected in the past are reduced to their legal maximums."). Still, the Court found that an "inescapable inference" foreclosed one particular remedy. The statute's separate right of action for damages "provide[d] an exclusive remedy relative to damages." *Id*. at 401. But "save [this] one aspect," the statute invoked "the broad equitable jurisdiction that inheres in courts." *Id.* at 403.

In *Mitchell* the Court applied *Porter* to section 17 of the Fair Labor Standards Act ("FLSA"), which gave district courts the jurisdiction to "restrain violations" of the statutory prohibition on firing employees for reporting workplace violations. 361 U.S. at 289. After quoting *Porter*'s broad language about equitable remedies, *Mitchell* reiterated that implied remedies must fit with the statutory purpose: "When Congress entrusts to an equity court the enforcement

of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes." *Id.* at 291–92.

Applying *Porter*'s presumption, the Court drew on its understanding of the FLSA's purpose, which was to achieve "minimum labor standards" by using worker complaints as a private enforcement mechanism. *Id.* at 292. The Court reasoned that restitution furthered that purpose. Without it, the "fear of economic retaliation" would stifle worker complaints. *Id.*

*Mitchell* then assessed whether anything in the FLSA precluded restitution as an implied remedy. The defendants pointed to the statute's ban on awarding unpaid minimum wages and overtime compensation as one such provision, but the Court disagreed. It found "no indication in the language of the [ban], or in the legislative history, that Congress intended [it] to have a wider effect." *Id.* at 294.

*Porter* and *Mitchell* were typical of their era: The Court would resolve ambiguities by identifying a statute's purpose and "deducing the result most consonant with that purpose." William N. Eskridge Jr., *Politics Without Romance: Implications of Public Choice Theory for Statutory Interpretation*, 74 VA. L. REV. 275, 282 (1988); *see also* John F. Manning, *Foreword: The Means of Constitutional Power*, 128 HARV. L. REV. 1, 16–17 (2014) ("However clearly Congress framed its statutes, the Court could rework them to fit with the background policies that inspired them."). Using this interpretive approach, the Court assumed that the judiciary could freely craft remedies to fully enforce whatever rights Congress had recognized. *See* Frank H. Easterbrook, *Foreword: The Court*

*and the Economic System*, 98 HARV. L. REV. 4, 45–51 (1983). As the Court would proclaim four years after *Mitchell*, "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose." *J. I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964).

\*   \*   \*

Lower-court interpretations of section 13(b) built on *Porter* and *Mitchell*. The trail starts with *FTC v. H. N. Singer, Inc.*, 668 F.2d 1108 (9th Cir. 1982). There the Ninth Circuit held that section 13(b)'s permanent-injunction provision implicitly authorizes preliminary injunctions and asset freezes.[2] *Id.* at 1113. While its analysis was cursory, *Singer* channeled *Porter* and *Mitchell*. The court held that preliminary injunctions and asset freezes advanced section 13(b)'s purpose by ensuring that assets were available at the end of the enforcement process. *Singer* also rejected the defendant's claim that the express equitable remedies in § 57b foreclosed implied remedies in section 13(b), pointing to the saving clause in § 57b(e).

*Singer* sparked a line of appellate cases holding that section 13(b) is a broad grant of equitable authority. The Elev-

---

[2] Shortly before *Singer*, the Fifth Circuit held that section 13(b)'s preliminary-injunction provision implicitly authorizes asset freezes. *See FTC v. Sw. Sunsites, Inc.*, 665 F.2d 711, 718 (5th Cir. 1982). But its holding appeared to preclude the possibility of restitution in section 13(b), pointing instead to § 57b for monetary remedies. *Id.* at 719 ("[T]he exhortation in [*Mitchell*] to preserve the possibility of complete relief … makes it appropriate to consider that the final, complete relief in this case may entail consumer redress through a [§ 57b] proceeding."). Predictably, no circuit has materially relied on *Southwest Sunsites* to support an implied restitution award.

enth Circuit followed *Singer*'s lead two years later. After quoting *Porter*'s language on implied remedies, the court concluded that it "agree[d] with *Singer*'s interpretation of [section] 13(b)" and without further discussion held that section 13(b) authorizes asset freezes. *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984) (per curiam).

Our decision in *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988), was next. There, the defendant passingly suggested that section 13(b)'s permanent-injunction provision does not implicitly authorize preliminary injunctions. (Recall that the statute's express authorization for temporary restraining orders and preliminary injunctions is tied to the eventual initiation of an administrative proceeding.) We held that the defendant waived the argument, but we discussed the issue anyway "in order to satisfactorily explain our disposition of … other issues." *Id.* at 1026. Because it was dicta, our reasoning was understandably brief. We simply quoted language from *Singer* and noted that we had "no reason to disagree with the conclusion of our colleagues of the Ninth and Eleventh Circuits that the authority to grant permanent injunctive relief also includes the authority to grant interlocutory relief." *Id.* Other than distinguishing a prior decision, we did not discuss the matter further.

Two months after *World Travel*, we concluded in *Elders Grain* that section 13(b)'s preliminary-injunction provision implicitly authorizes rescission. 868 F.2d at 907. Perhaps because the parties didn't dispute the issue, our analysis was again cursory. But it was highly consequential. We articulated a new standard for inferring equitable remedies: "[T]he statutory grant of the power to issue a preliminary injunc-

tion carries with it the power to issue whatever ancillary equitable relief is necessary to the effective exercise of the granted power." *Id.* Notably absent was any inquiry into whether an implied remedy was compatible with the statutory text and structure or whether Congress precluded the implied remedy. We instead would permit whatever implied remedies furthered the exercise of the express remedy.

The effect of this reasoning was evident in our justification for inferring the power to order rescission. We simply restated the facts of the case, which involved a transaction timed to avoid the Commission's review, and observed that "[t]o reward these tactics by holding that a district court has no power under section 13(b) to rescind a consummated transaction would go far toward rendering the statute a dead letter." *Id.*

We extended *Elders Grain* to the permanent-injunction provision three months later in *Amy Travel*. The district court had ordered the defendants to pay more than $6 million in restitution to the Commission. *Amy Travel*, 875 F.2d at 570. The defendants argued on appeal that nothing in section 13(b) authorized monetary relief. We disagreed, explaining that our then-recent decisions in *World Travel* and *Elders Grain* "thwarted" the defendants' arguments. *Id.* at 571. In particular, we said that the reasoning in *Elders Grain* applied "with equal force" to the permanent-injunction provision. We adopted that expansive formulation, holding that section 13(b)'s "statutory grant of authority to the district court to issue permanent injunctions includes the power to order any ancillary equitable relief necessary to effectuate the exercise of the granted powers." *Id.* at 572. But unlike *Elders Grain*, we never addressed how an award of restitution was "necessary

to effectuate the exercise" of the power to issue an injunction. We simply noted that restitution was a "proper form[] of ancillary relief." *Id.* at 571.

Our approach in *Amy Travel* became the standard. Some circuits held, on a similarly brief analysis, that section 13(b) categorically authorizes the court's "*full* equitable powers," including restitution. *See FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996) (emphasis added); *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1314–15 (8th Cir. 1991). Others simply cited *Amy Travel* or other decisions to reach the same conclusion. *See FTC v. Bronson Partners, LLC*, 654 F.3d 359, 365 (2d Cir. 2011); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005); *FTC v. Pantron I. Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994); *see also FTC v. Ross*, 743 F.3d 886, 891 (4th Cir. 2014) (conceding that "arguments about how the structure, history, and purpose of the [FTCA] weigh against the conclusion that district courts have the authority to award consumer redress … are not entirely unpersuasive" but allowing restitution because of *Porter*, *Mitchell*, and uniform circuit practice).

To be sure, these decisions have attracted some judicial skepticism. *See Shire ViroPharma*, 917 F.3d at 156, 161 n.19 (declining to decide whether section 13(b) authorizes monetary relief but concluding that it wasn't "meant to duplicate [§ 45(b)], which already prohibits past conduct"); *FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417, 429 (9th Cir. 2018) (O'Scannlain, J., concurring) (disagreeing with the prevailing interpretation). But the view that section 13(b) implicitly

authorizes restitution has largely escaped critical examination.[3]

We have affirmed restitution awards under section 13(b) three times since *Amy Travel*. *See United States v. Tankersley*, 96 F. App'x 419, 422 (7th Cir. 2004); *FTC v. Think Achievement Corp.*, 312 F.3d 259, 262 (7th Cir. 2002); *FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997). But Brown is the first litigant to question our precedent.

### 3. *Modern Implied-Remedies Jurisprudence*

The Supreme Court's understanding of implied remedies evolved after *Porter* and *Mitchell*. Though the Court continued to presume that courts could "use any available remedy to afford full relief" when a party had a general statutory cause of action, over time it began to emphasize that this presumption "yields where necessary to carry out the intent of Congress or to avoid frustrating the purposes of the statute involved." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998) (quoting *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 595 (1983) (White, J., op.)); *see also California v. Sierra Club*, 451 U.S. 287, 297 (1981) ("The federal

---

[3] Chief Judge Wood's dissent from the denial of rehearing en banc relies heavily on *FTC v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011), but there the Second Circuit summarily followed the lead of other circuits in reading section 13(b) to include an implied power to order restitution. *Id.* at 365. The court quickly moved on to, and thoroughly considered, a wholly different question: whether the implied restitution remedy is equitable or legal. The lengthy passages quoted in the chief judge's dissent relate to that second-order question. Moreover, *Bronson* rejected the view that the plain meaning of "injunction" encompasses restitution. *Id.* at 367 (approving restitution because "section 13(b) does not limit the district court to awarding *only injunctions*") (emphasis added).

judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide."). In particular, the Court now recognizes the importance of Congress's choice to specify forms of relief. *See, e.g.*, *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 69 n.6 (1992) (noting that the presumption in favor of relief doesn't apply "under a statute that expressly enumerated the remedies available to plaintiffs"); *see also Karahalios v. Nat'l Fed'n of Fed. Emps.*, 489 U.S. 527, 533 (1989) ("It is … an elemental canon of statutory construction that where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies.") (quotation marks omitted).

A prominent example is ERISA. Because Congress has established a comprehensive remedial scheme for plaintiffs to enforce their rights under an employee-benefits plan, the Court has refused to infer additional extracontractual damages remedies. *See Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985) ("The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement.") (quotation marks omitted). And where two environmental-protection statutes provide private rights of action for injunctive relief but require plaintiffs to notify defendants 60 days before suing, the Court has refused to infer a damages remedy or allow plaintiffs to obtain an injunction without the requisite notice. *See Nat'l Sea Clammers Ass'n*, 453 U.S. at 15 ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate.").

These decisions collided with *Porter* and *Mitchell* in *Meghrig v. KFC Western, Inc.*, 516 U.S. 479 (1996). Because Brown's challenge centers on *Meghrig*, it warrants close review. There the Court addressed the Resource Conservation and Recovery Act of 1976 ("RCRA"), which permits private parties to sue handlers of "solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). The statute authorizes district courts "to restrain" any person who contributes to handling the waste, "to order such person to take such other action as may be necessary, or both." § 6972(a). The question in *Meghrig* was whether § 6972(a) also allowed plaintiffs to recover waste-cleanup costs as restitution.

The Supreme Court refused to find an implied restitutionary remedy. "Under a plain reading of this remedial scheme," the Court explained, plaintiffs could receive "a mandatory injunction, *i.e.*, one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, *i.e.*, one that 'restrains' a responsible party from further violating [the] RCRA." *Meghrig*, 516 U.S. at 484. But neither of these forward-facing remedies "contemplates the award of past cleanup costs, whether these are denominated 'damages' or 'equitable restitution.'" *Id.*

The Court reinforced its holding by comparing the RCRA to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, which addresses similar toxic-waste issues. *Meghrig*, 516 U.S. at 485. Unlike the RCRA, CERCLA expressly authorizes monetary relief. 42 U.S.C. § 9607(a)(4). "Con-

gress thus demonstrated in CERCLA that it knew how to provide for the recovery of cleanup costs[] and that the language used to define the remedies under [the] RCRA does not provide that remedy." *Meghrig*, 516 U.S. at 485.

The Court also pointed to the statute's threshold requirement that a party can sue only when the waste "may present an imminent and substantial endangerment to health or the environment." § 6972(a)(1)(B). "The meaning of this timing restriction [was] plain" to the Court: "[S]ection 6972(a) was designed to provide a remedy that ameliorates present or obviates the risk of future 'imminent' harms, not a remedy that compensates for past cleanup efforts." *Meghrig*, 516 U.S. at 485–86.

Finally, the Court looked to "[o]ther aspects of [the] RCRA's enforcement scheme." *Id.* at 486. Unlike CERCLA, the RCRA's citizen-suit provision lacks a statute of limitations or a requirement that any recovered costs must be reasonable. The Court reasoned that "[i]f Congress had intended § 6972(a) to function as a cost-recovery mechanism, the absence of these provisions would be striking." *Id.* The RCRA also halts citizen suits when the EPA or a state pursues an enforcement action, and it requires plaintiffs to give 90-days' notice to potential defendants before suing. *See id.* These two requirements made § 6972(a) a "wholly irrational mechanism" for remedying past harms. *Id.*

The Court then acknowledged the "line of cases holding that district courts retain inherent authority to award any equitable remedy that is not expressly taken away from them by Congress." *Id.* at 487 (citing *Porter*, 328 U.S. 395). But these cases couldn't support an implied restitution remedy. As the Court put it:

> [T]he limited remedies described in § 6972(a), along with the stark differences between the language of that section and the cost-recovery provisions of CERCLA, amply demonstrate that Congress did not intend for a private citizen to be able to undertake a cleanup and then proceed to recover its costs under [the] RCRA. … [W]here Congress has provided elaborate enforcement provisions for remedying the violation of a federal statute, as Congress has done with [the] RCRA and CERCLA, it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens suing under the statute. It is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.

*Id.* at 487–88 (quotation marks omitted). Notwithstanding *Porter*, the Court held that § 6972(a) does not "contemplate the award of past cleanup costs." *Id.* at 488.

Since *Meghrig*, the Court has adhered to this more limited understanding of judicially implied remedies. *See, e.g.*, *Great-West*, 534 U.S. at 209 ("We have therefore been especially reluctant to tamper with the enforcement scheme embodied in [ERISA] by extending remedies not specifically authorized by its text.") (quotation marks and alteration omitted); *Miller v. French*, 530 U.S. 327, 340 (2000) (concluding that the plain meaning of a provision expressed the congressional intent to displace equitable authority); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385 (2015) (hold-

ing that the Medicaid Act's provision of a specific remedy and the judicially unadministrable nature of the relevant statutory provision "preclude[d] the availability of equitable relief" in section 30(A) of the statute); *Gebser*, 524 U.S. at 284 (holding that courts cannot enlarge the "scope of available remedies" under an implied right of action "in a manner at odds with the statutory structure and purpose"). Rather than presuming that Congress authorizes the judiciary to supplement express statutory remedies, the Court now recognizes that "the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Armstrong*, 135 S. Ct. at 1385.

### 4. *Revisiting* Amy Travel

As this perhaps drawn-out discussion shows, an exploration of statutory purpose is no longer the Supreme Court's polestar in cases raising interpretive questions about the scope of statutory remedies, and that shift has unsettled *Porter*'s and *Mitchell*'s instruction to "provide complete relief in light of the statutory purposes." *Mitchell*, 361 U.S. at 292; *see also Singer*, 668 F.2d at 1113 (grounding its reading of section 13(b) on this premise). *See generally* Manning, *supra*, at 23 ("[W]here 'the statutory language is clear,' the Court has disclaimed the need even 'to reach arguments based on statutory purpose[] [or] legislative history.'" (quoting *Boyle v. United States*, 556 U.S. 938, 950 (2009))); WILLIAM N. ESKRIDGE JR., INTERPRETING LAW: A PRIMER ON HOW TO READ STATUTES AND THE CONSTITUTION 81 (2016) ("We are all textualists. That means that a judge must relate all sources of and arguments about statutory interpretation to a text the legislature has enacted."). Indeed, the Court has "abandoned" its prior understanding that judges must "be alert to provide

such remedies as are necessary to make effective the con-gressional purpose expressed by a statute." *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001) (quotation marks omitted); *accord Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017). It is now well settled that Congress, not the judiciary, controls the scope of remedial relief when a statute provides a cause of action. *See Armstrong*, 135 S. Ct. at 1385 ("Courts of equity can no more disregard statutory and constitutional require-ments and provisions than can courts of law.") (quotation marks omitted); Thomas W. Merrill, *The Disposing Power of the Legislature*, 110 COLUM. L. REV. 452, 465–66 (2010).

Whatever strength *Porter* and *Mitchell* retain, *Meghrig* clarifies that they cannot be used as *Amy Travel* saw them—a license to categorically recognize all ancillary forms of equitable relief without a close analysis of statutory text and structure. To be sure, the Court still presumes that courts retain their "traditional equitable authority." *Miller*, 530 U.S. at 340. But even under *Porter* and *Mitchell*, this authority comes with an important qualifier: "unless otherwise pro-vided by statute." *Porter*, 328 U.S. at 398; *Mitchell*, 361 U.S. at 291. Unsurprisingly, every appellate court to consider the relationship between *Meghrig*, *Porter*, and *Mitchell* recognizes that *Meghrig* reinforced and clarified this qualifier.

Some circuits have concluded that a statute displaces eq-uitable authority when it specifies a particular remedy. *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co.*, 632 F.3d 1111, 1121 (9th Cir. 2011) (finding that a statutory provision allowing a person to seek "injunctive relief" acted "to the exclusion of other equitable remedies"); *Landstar Sys.*, 622 F.3d at 1324 (noting that the statute at issue authorized only injunctions and concluding that if it "allowed for

restitution or disgorgement, it would have so stated"). Others more narrowly construe *Meghrig* as a command that "courts must consider a statute's remedial scheme" when determining whether a statute displaces equitable authority. *See United States v. Lane Labs-USA Inc.*, 427 F.3d 219, 235 (3d Cir. 2005); *see also United States v. Rx Depot, Inc.*, 438 F.3d 1052, 1057 (10th Cir. 2006) (reading *Meghrig* as showing that "a statute's particular characteristics" can displace equitable authority).

The D.C. Circuit thoroughly examined the effect of *Meghrig* in *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190 (D.C. Cir. 2005). Harmonizing *Meghrig* and *Porter*, it held that a statute's "comprehensive and reticulated scheme, along with the plain meaning of the words themselves, serves to raise a necessary and inescapable inference, sufficient under *Porter*, that Congress intended to limit relief." *Id.* at 1200 (quotation marks and citation omitted).

We don't need to plant ourselves firmly along this doctrinal spectrum to decide this case. It's inescapable that *Meghrig* not only displaced *Amy Travel*'s categorical approach to judicially implied remedies but also its interpretation of section 13(b). Every one of *Meghrig*'s reasons for refusing to find restitutionary authority in the RCRA applies with equal force to section 13(b).

Like the RCRA, section 13(b)'s plain text doesn't contemplate an award of restitution. *See Meghrig*, 516 U.S. at 484. It authorizes only temporary restraining orders and injunctions. And like the relationship between the RCRA and CERCLA, the relationship between section 13(b), § 45(*l*), and § 57b(b) "is telling." *Id.* at 485. Both § 45(*l*) and § 57b(b) expressly authorize additional equitable remedies. § 45(*l*)

("mandatory injunctions and such other and further equitable relief as [courts] deem appropriate"); § 57b(b) ("such relief as the court finds necessary … , [including] the refund of money or return of property"). Section 13(b) lacks comparable language.

*Meghrig* also instructs us to interpret remedial language with reference to "the harm at which it is directed." 516 U.S. at 485. While the FTCA's express restitution provisions authorize the Commission to sue for past conduct, to proceed under section 13(b), the Commission must reasonably believe that a person "is violating" or "about to violate" the law. § 53(b)(1); *cf.* § 45(b) (empowering the Commission to bring a cease-and-desist action when it reasonably believes someone "has been or is" violating the act). As with the RCRA, "[t]he meaning of this timing restriction is plain." *Meghrig*, 516 U.S. at 485. Section 13(b) "was designed to provide a remedy that ameliorates present or obviates the risk of future 'imminent' harms, not a remedy that compensates" for past violations. *Id.* at 486.

Further, as we've explained, section 13(b) is procedurally incompatible with restitution. For example, before invoking section 13(b), the Commission must reasonably believe that stopping an ongoing or imminent violation is in the public interest. § 53(b)(2). And the statute dissolves a preliminary injunction if the Commission doesn't begin an administrative proceeding before a court-set deadline. § 53(b). But the Commission would have no need for an administrative proceeding if it can get complete restitutionary relief through section 13(b)'s permanent-injunction provision. In short, section 13(b)'s prerequisites, like those in the RCRA,

make it a "wholly irrational mechanism" for remedying past harms. *Meghrig*, 516 U.S. at 486.

Relatedly, unlike § 57b(b), section 13(b) has no statute of limitations. The absence of a limitations period in the RCRA was "striking" to the *Meghrig* Court and provided strong evidence that the RCRA's injunction provision did not implicitly authorize restitution. *Id.* The same is true here.

Section 13(b) also lacks a central feature of the FTCA provisions that expressly permit monetary relief: a notice requirement. When the Commission brings an administrative cease-and-desist action, it can secure restitution only by proving that the violation occurred after its order became final or that "a reasonable man" would have known that the conduct was fraudulent. §§ 45(*l*); 57b(a)(2). And notice is also baked into the Commission's power to promulgate and enforce rules. The Commission must follow detailed procedures before promulgating a final rule. *See id.* § 57a(b)(1) (requiring publication of notice and an informal hearing for rulemaking). Moreover, final rules must "define with specificity" the prohibited acts. § 57a(a)(1)(B).

The Supreme Court has held that similar provisions are crucial to determining the remedial scope of implied rights of action, a closely related context: "It would be unsound … for a statute's *express* system of enforcement to require notice to the recipient and an opportunity to come into voluntary compliance while a judicially *implied* system of enforcement permits substantial liability without regard to the recipient's knowledge or its corrective actions upon receiving notice." *Gebser*, 524 U.S. at 289. We face the same unsound result here: Reading an implied restitution remedy into section

13(b) allows the Commission to circumvent the FTCA's detailed notice requirements.

Finally, we note that the difference in plaintiffs—private citizens in *Meghrig* and a federal agency here—isn't material. To be sure, when "the public interest is involved in a proceeding," a court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Porter*, 328 U.S. at 398; *accord Kansas v. Nebraska*, 135 S. Ct. 1042, 1053 (2015). But the public interest doesn't turn on the identity of the parties involved.

*Virginian Railway Co. v. System Federation No. 40*, 300 U.S. 515, 552 (1937), the authority *Porter* cited to invoke the "public interest," is instructive on this point. Even though the suit was between a railroad company and a union, the Court determined that "[m]ore [was] involved than the settlement of a private controversy." *Id.* "The peaceable settlement of labor controversies … is a matter of public concern." *Id.*; *see also id.* ("The fact that Congress has indicated its purpose to make negotiation obligatory is in itself a declaration of public interest and policy … ."). Presaging *Porter*, the Court observed that "[c]ourts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Id.*; *cf. Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 326 & n.8 (1980) ("When the EEOC acts, albeit at the behest of and for the benefit of specific individuals, it acts also to vindicate the public interest in preventing employment discrimination." (citing *Porter*, 328 U.S. at 397–98)).

Under *Virginian Railway Co.*, both *Meghrig* and this case implicate the public interest. Both involve enforcing federal

statutory obligations, and both involve matters of "public concern"—environmental cleanup and consumer protection. Even so, *Meghrig* did not find an implied right to restitution in the RCRA. So the fact that the government is the plaintiff here does not affect the analysis. Consider *United States v. Apex Oil Co.*, in which we examined *Meghrig*'s impact on 42 U.S.C. § 6973(a), the RCRA's *government*-suit provision. 579 F.3d 734 (7th Cir. 2009). We did not draw a distinction between the RCRA's government and citizen-suit provisions. Observing that the provisions use "identical language," we concluded that the RCRA "entitles the government only to require the defendant to clean up the contaminated site at the defendant's expense." *Id.* at 737. We then announced that our "[e]arlier cases, … which allowed an award of clean-up costs on the basis of general equitable principles set forth in such cases as *Mitchell v. Robert De Mario Jewelry, Inc.*, and *Porter v. Warner Holding Co.*, are dead after *Meghrig*." *Id.* (citations omitted).

Although section 13(b) doesn't use identical language as the RCRA's citizen-suit provision, *Meghrig* remains materially indistinguishable. So we must pay close attention to its bottom line: "[W]here Congress has provided elaborate enforcement provisions for remedying the violation of a federal statute, … it *cannot* be assumed that Congress intended to authorize by implication additional judicial remedies … ." *Meghrig*, 516 U.S. at 487–88 (emphasis added) (quotation marks omitted); *see also Gebser*, 524 U.S. at 290 ("Where a statute's express enforcement scheme hinges its most severe sanction on notice and unsuccessful efforts to obtain compliance, we *cannot* attribute to Congress the intention to have implied an enforcement scheme that allows

imposition of greater liability without comparable conditions.") (emphasis added).

Our limited analysis in *Amy Travel* doesn't offer a way to distinguish *Meghrig*. It instead requires us to ignore section 13(b)'s text and disregard the FTCA's "elaborate enforcement provisions." In light of the Court's commands in *Meghrig*, our holding in *Amy Travel* is no longer viable. Conversely, reading section 13(b) as authorizing only injunctive relief — that is, reading it to mean what it plainly says — harmonizes *Meghrig* with *Porter* and *Mitchell*, which also called for a statute-specific and remedy-specific inquiry before authorizing an implied form of relief. *See, e.g., Porter*, 328 U.S. at 403 (holding that a separate cause of action for damages was enough to preclude courts from inferring that remedy elsewhere).

We recognize that this conclusion departs from the consensus view of our sister circuits. But when deciding whether we should overturn precedent, "[w]e are not merely to count noses. The parties are entitled to our independent judgment." *United States v. Hill*, 48 F.3d 228, 232 (7th Cir. 1995). And we must break from our colleagues. As noted, most circuits adopted their position by uncritically accepting our holding in *Amy Travel*, which expanded on *Elders Grain*, which expanded on *Singer*, which expanded on *Porter* and *Mitchell*. No circuit has examined whether reading a restitution remedy into section 13(b) comports with the FTCA's text and structure. Nor has anyone determined whether § 45 forecloses this remedy. And although some have briefly discussed § 57b, they have done so only to find refuge in the saving clause in § 57b(e). Perhaps most importantly, no

circuit has ever considered the effect of *Meghrig* in a section
13(b) case.

We are well aware that we need a compelling reason to
overturn circuit precedent. "However, important as *stare
decisis* is, it is equally important for us to respect the statutes
that Congress has passed and to correct any problems we see
in our prior interpretations of those statutes." *Ahng v. All-
steel*, 96 F.3d 1033, 1037 (7th Cir. 1996); *see also S. Ill. Power
Coop. v. EPA*, 863 F.3d 666, 673 (7th Cir. 2017) (noting that
statutory stare decisis "is not without limits"). Even in the
realm of statutory interpretation, a Supreme Court decision
"on an analogous issue that compels us to reconsider our
position" counts as a compelling reason to overturn prece-
dent. *Glaser*, 570 F.3d at 915. We cannot favor our own
decisions over those of the Supreme Court.

Stare decisis alone cannot overcome *Amy Travel*'s clear
incompatibilities with the FTCA's text and structure,
*Meghrig*, and the Supreme Court's broader refinement of its
implied remedies jurisprudence. We therefore hold that
section 13(b)'s permanent-injunction provision does not
authorize monetary relief.[4]

---

[4] Because we hold that section 13(b) doesn't authorize monetary relief,
we have no need to consider Brown's alternative arguments that the
Commission can't pursue penalties or legal—as distinct from equitable—
restitution under section 13(b). *See FTC v. AMG Capital Mgmt., LLC*,
910 F.3d 417, 429 (9th Cir. 2018) (O'Scannlain, J., concurring) (discussing
these arguments). We also don't need to consider the district court's
asset-freeze determinations.

### III. Conclusion

For the foregoing reasons, we VACATE the restitution award. In all other respects, we AFFIRM the judgment.

WOOD, *Chief Judge*, with whom ROVNER and HAMILTON, *Circuit Judges*, join, dissenting from the denial of rehearing *en banc*. For decades, this court has successfully used a local rule, Circuit Rule 40(e), for two important purposes: to highlight a decision to create a conflict in the circuits, and to clean up earlier decisions whose soundness has been undermined by later legislation, Supreme Court activity, or a consensus among our sister circuits. Yet we have taken care not to use Rule 40(e) in a way that defeats our profound commitment to oral argument—a commitment that sets us apart from most of the other circuits, and one that consistently improves the quality of our decisionmaking. The opportunity to ask questions of counsel, to hear the questions of fellow judges, and to have a full debate after argument regularly reveals aspects of a case that even the most thorough reading of the briefs on one judge's part cannot provide.

The majority, however, has chosen to use Rule 40(e) in the case now before us. It is a singularly inappropriate case for that treatment: it overrules not only a long-standing decision from this court, *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989), but it also pays no heed to the fact that eight other circuits agree with the *Amy Travel* approach. See Brief of the Federal Trade Commission at 28 n. 12. Perhaps if a recent Supreme Court decision demanded that sea change, the majority's opinion would be defensible. But there is no such decision. Instead, the majority extrapolates from the line of cases addressing whether a private party has an implied right of action to the issue presented here: whether a government agency, the Federal Trade Commission, which enjoys an express right of action under a statute for injunctive relief, is entitled to a restitutionary remedy that is ancillary to, or part of, the injunction.

To my knowledge, no court has ever tied the hands of a government agency in the way that the majority has done here, and the majority cites none. It has taken this step without the careful consideration that plenary *en banc* review would have provided. I am reminded of the words spoken by Gaius Julius Caesar in 49 B.C.E., as he approached the Rubicon river at the head of his army. He knew that the Roman Senate forbade any armed force to enter Rome. But he decided to flout that command, and as he marched with his troops across the river, he is said to have proclaimed "alea iacta est" – the die is cast. And indeed it was. Caesar's act led to civil war and eventually the end of the Roman Republic; he became dictator for life and inaugurated the Roman Empire. See, *e.g.*, Meaning Behind the Phrase to Cross the Rubicon, https://www.thoughtco.com/meaning-cross-the-rubicon-117548. I devoutly hope that the majority here has not cast the die in a way that will transform Rule 40(e) from an efficiency-promoting rule for relatively routine updates to our circuit law into something that erodes our commitment to plenary consideration, along with oral argument, of every fully counseled case. Time will tell. But the Rule is surely being misused in this case. Perhaps that would not matter if no reasonable person could question the correctness of the majority's reasoning. Regrettably, that is not the case. From the materials now before us, I believe that the court is making a mistake, and it is doing so in a procedurally inappropriate way.

The central issue in the case relates to the proper interpretation of section 13(b) of the FTC Act, 15 U.S.C. § 53(b), which authorizes the Commission to sue for injunctive relief. Injunctions come in all shapes and sizes: some are prohibitory, some are mandatory, some include submission to an equitable master, some include reporting requirements, and many include

ancillary measures that are designed to ensure that the injunction is effective. At least since our decision in *Amy Travel*, the Federal Trade Commission has understood that its authority to seek an injunction from the court includes the authority to seek a measure commanding the defendant to disgorge unlawfully acquired money or property. In other words, the injunction may include an order from the court for the disgorgement type of restitution.

Obviously the restitution itself is not an "injunction," any more than the master is an "injunction," or the reporting requirements are an "injunction." The injunction is the order from the court either to do something or to refrain from doing something. Black's Law Dictionary lists 25 different types of injunctions under that general heading. See entry for "injunction," Black's Law Dictionary at 904–05 (10th ed. 2014). The term "injunction" itself is defined simply as "A court order commanding or preventing an action." *Id.* A "mandatory injunction" is one "that orders an affirmative act or mandates a specified course of conduct." *Id.* Nothing whatever in section 13(b) deletes from the list of possible affirmative acts that an injunction may include an order requiring the enjoined party to return ill-gotten gains, or to pay money into a court escrow account, or otherwise to turn over property. That should be enough by itself to show the error in the path the majority has taken.

The majority rejects this straightforward reading of the statute and argues to the contrary that "the textual case in the FTCA against implying restitution in section 13(b) is overwhelming." But more than rhetoric is needed to establish that point. From my standpoint, if the text is overwhelming at all, I find it overwhelmingly to support the power of the FTC to

use any of the tools that Congress gave it, including the one it used here, which entitles it to seek injunctive relief from a court.

The Supreme Court supported the approach I would take in *California v. American Stores Co.*, 495 U.S. 271 (1990). There the question was whether "divestiture is a form of injunctive relief within the meaning of" section 16 of the Clayton Act, 15 U.S.C. § 26. 495 U.S. at 275. After the FTC had decided not to challenge a merger of certain grocery stores in California, the merger was consummated. The next day, however, the State of California filed an action in federal court alleging that the merger violated section 1 of the Sherman Act, 15 U.S.C. § 1, and seeking "an injunction requiring American to divest itself of all of [the acquired firm's] assets and businesses in the State of California." 495 U.S. at 276. The district court had granted a preliminary injunction along those lines, but the Ninth Circuit reversed on the ground that the injunctive relief authorized by the statute did not include divestiture. The Supreme Court reversed the court of appeals, finding that "the statutory language [of section 16] indicates Congress' intention that traditional principles of equity govern the grant of injunctive relief." *Id.* at 281. An order of divestiture is almost identical to an order requiring equitable restitution: both require the wrongdoer to turn over property that was unlawfully obtained. Similarly, the language of section 16 of the Clayton Act is not materially different from the language of section 13(b) of the FTC Act. In my view, the majority's approach conflicts with the most closely applicable Supreme Court decision.

This is especially troubling because the majority has not pointed to any case in which the Supreme Court has said that a federal agency must avoid one type of remedial authority it

holds and instead use a different type. That, effectively, is what the majority has done here, in its discussion of the various tools the FTC Act provides for enforcement of the prohibition against unfair or deceptive trade practices. *Ante* at 11. The Commission may use its "cease and desist" power in an administrative proceeding, see FTC Act § 5(b), 15 U.S.C. § 45(b); it may, after providing notice to the Attorney General under section 16 of the FTC Act, 15 U.S.C. § 56, sue someone who violates a cease-and-desist order, see FTC Act § 5(*l*)–(m), 15 U.S.C. § 45(*l*)–(m); it may promulgate rules that define unfair or deceptive practices, FTC Act § 18, 15 U.S.C. § 57a; or it may (as it did here) file a suit in federal court for an injunction, FTC Act § 13(b), 15 U.S.C. § 53(b).

The Supreme Court recognizes that agencies have broad discretion in their choice of which of several authorized procedural tools they wish to use as they carry out their mission. The best-known example of this practice comes from the field of labor law. The National Labor Relations Board has both rulemaking power, see 29 U.S.C. § 156, and adjudicatory powers, see 29 U.S.C. § 160. The Board does not, however, follow the practice of using its rulemaking powers when it announces new rules; it prefers to proceed on a case-by-case basis through the adjudicative process. See, *e.g.,* Mark H. Grunewald, *The NLRB's First Rulemaking: An Exercise in Pragmatism*, 41 DUKE L.J. 273 (1991). Over the years people have challenged this choice on the ground that the Board is evading the detailed protections for rulemaking that Congress has provided in the Administrative Procedure Act, 5 U.S.C. § 553, but the Supreme Court has always rejected those arguments. See, *e.g., NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267 (1974), confirming the rule from *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759 (1969), to this effect. As the *Bell Aerospace*

opinion put it, "[t]he views expressed in *Chenery II* and *Wyman-Gordon* make plain that the Board is not precluded from announcing new principles in an adjudicative proceeding and that the choice between rulemaking and adjudication lies in the first instance within the Board's discretion. Although there may be situations where the Board's reliance on adjudication would amount to an abuse of discretion or a violation of the Act, nothing in the present case would justify such a conclusion." 416 U.S. at 294.

I can think of no principled reason why the Labor Board should have that discretion, but the FTC should not. The majority argues to the contrary from a line of cases that is inapposite. It conflates decisions about *which plaintiffs* are authorized to bring a suit (the implied-right-of-action line) with the distinct question about *what remedies* are available to a party that is expressly authorized by statute to sue, as the FTC surely is here. The cases on which the panel relies all involve private enforcement, where the Court has warned us to ensure that we should not permit a facile work-around to a complex enforcement system. See, *e.g.*, *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14 (1981). A case involving public enforcement is quite different. If the agency believes that Path A has certain advantages and downsides, while Path B has different plusses and minuses, neither approach should be read out of the statute. Both are available to the agency, and each one will serve its intended functions, constrained by its safeguards.

The majority thinks that it would be "wholly irrational" for Congress to write a statute that provides for restitution as part of a 13(b) temporary restraining order, preliminary injunction, or permanent injunction, while also spelling out

less-streamlined options for the Commission to pursue. But this ignores real differences among its options. Perhaps, because of the risk of dissipation of ill-gotten gains, the Commission might want restitution to begin right away while the case is pending, *e.g.*, through payment into a court-operated escrow account; in order to do that, it can seek a preliminary injunction for the turn-over of funds. In another case, the Commission might prefer to use the cease-and-desist route and develop the factual record through its own administrative processes—ensuring judicial deference to its fact-finding down the road—rather than operate under the thumb of a court.

Branding such a scheme as "wholly irrational" is unwarranted without a more focused examination of why the Commission might choose one route or another—a choice, I reiterate, that we usually allow agencies to make. *Cf. Bell Aerospace*, 416 U.S. at 294–95 (concluding that agency has power to choose adjudication or rulemaking as a means to announce new principles while examining agency's legitimate reasons for pursuing one or the other method of proceeding). Such an inquiry requires a deferential look at why Congress gave the agency a menu of options. That is just what Congress did in the FTC Act. The statute gives the Commission the ability to move unilaterally when it uses its rulemaking or cease-and-desist powers, and to act as a party before the court if it wants a preliminary or permanent injunction. It is not up to us to take away that which Congress gave.

Another inapposite line of cases on which the majority relies addresses implied private rights of action—a problem we surely do not have here. See, *e.g.*, *Alexander v. Sandoval*, 532 U.S. 275 (2001). Rather than a private party, we have a

government agency, and rather than an implied right of action, we have an express statutory provision authorizing the agency to seek injunctive relief. That makes a difference. Indeed, in a number of areas—antitrust, securities regulation, RICO—the Supreme Court has begun drawing a distinction between the breadth of a private right of action and the greater breadth appropriate for public enforcement. Thus, in *RJR Nabisco Inc. v. European Community*, 136 S. Ct. 2090 (2016), the Court found that private parties (including for this purpose the European Community, which had no special governmental status under the applicable law) cannot enforce RICO extraterritorially, but that the U.S. government stands in a different position. The Court made the same point in *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004):

> In all three cases [on which the Empagran plaintiffs relied], however, the plaintiff was the Government of the United States. A Government plaintiff, unlike a private plaintiff, must seek to obtain the relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm. And a Government plaintiff has legal authority broad enough to allow it to carry out this mission. 15 U.S.C. § 25 … . Private plaintiffs, by way of contrast, are far less likely to be able to secure broad relief. See *California v. American Stores Co.*, 495 U.S. 271, 295 (1990) ("Our conclusion that a district court has the power to order divestiture in appropriate cases brought [by private plaintiffs] does not, of course, mean that such power should be exercised in every situation in which the Government would be entitled to such

relief... ."); 2 P. Areeda, Hovenkamp & R. Blair, Antitrust Law ¶¶ 303d–303e, pp. 40–45 (2d ed. 2000) (distinguishing between private and government suits in terms of availability, public interest motives, and remedial scope) … . This difference means that the Government's ability, in these three cases, to obtain relief helpful to those injured abroad tells us little or nothing about whether this Court would have awarded similar relief at the request of private plaintiffs.

*Id.* at 170–71.

The panel's effort to explain why injunctive relief cannot include an order to disgorge money by reference to *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), is no more successful. *Wal-Mart* was a class action case, through and through. Most of it deals with the inappropriateness of a money-damages action under Federal Rule of Civil Procedure 23(b)(3) for the sprawling and unmanageable class that the plaintiffs had proposed. But the Court also addressed the plaintiffs' back-up position, which was their effort to certify a class for backpay claims under Rule 23(b)(2). Subpart (b)(2) of the rule allows a class if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Note the emphasis in this language on *general* grounds, and relief that works for the class *as a whole.* As the Court pointed out, that unity of interests is especially critical in a (b)(2) class, because the unnamed class members have no right to notice and the chance to opt out of such a class, yet they would be bound by the outcome

of the lawsuit. Those concerns are miles away from what we have in this case.

What the Court said in *Wal-Mart* is that claims for monetary relief cannot be certified "at least where (as here) the monetary relief is not incidental to the injunctive or declaratory relief." 564 U.S. at 360. It went on to explain itself as follows:

> One possible reading of [Rule 23(b)(2)] is that it applies *only* to requests for such injunctive or declaratory relief and does not authorize the class certification of monetary claims at all. We need not reach that broader question in this case, because we think that, at a minimum, claims for *individualized* relief (like the backpay at issue here) do not satisfy the Rule. The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted— the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Nagareda, 84 N.Y.U.L.Rev., at 132. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages. …

>Given that structure, we think it clear that individualized monetary claims belong in Rule 23(b)(3). The procedural protections attending the (b)(3) class—predominance, superiority, mandatory notice, and the right to opt out—are missing from (b)(2) not because the Rule considers them unnecessary, but because it considers them unnecessary *to a (b)(2) class*. When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident. But with respect to each class member's individualized claim for money, that is not so—which is precisely why (b)(3) requires the judge to make findings about predominance and superiority before allowing the class."

*Id.* at 360–63.

One cannot read this excerpt—lengthy in order to ensure that the full context comes through—without seeing that the Court was concerned solely about which type of class action should be used where money is concerned. No such problem is possible in the case before us. First, since there is only one plaintiff—the Commission—we have no unnamed class members to worry about. Second, the court in our case does not need to worry about individualized relief. The FTC is itself entitled to seek relief on behalf of those injured by Credit Bureau's misdeeds. *Cf. EEOC v. Bd. of Regents of the Univ. of Wis. Sys.*, 288 F.3d 296, 300 (7th Cir. 2002) (EEOC may pursue

age-discrimination case against a state entity on behalf of individual employees, even though individual cases would be barred by the state's sovereign immunity).

Credit Bureau must merely turn over to the FTC a single lump sum representing the total restitution due. This is the end of the court's involvement with the equitable relief in this case. As the district court wrote, "[j]udgment in the amount of Five Million, Two Hundred Sixty Thousand, Six Hundred Seventy-One and Thirty-Six Cents ("5,260,671.36") is entered in favor of the Commission against Defendants, jointly and severally, as equitable monetary relief. Defendants are ordered to *pay to the Commission* [$5,260,671.36]. Such payment must be made within 7 days of entry of this Order …" Final Judgment and Order for Permanent Injunction and Other Equitable Relief Against Defendants Credit Bureau Center, LLC and Michael Brown (Kennelly, J.) (June 26, 2018) (emphasis added). It then falls to the Commission to craft a plan to return the ill-gotten gains to each person who was harmed, where possible, and then turn over the remaining money to the Treasury. See FTC Office of Claims and Refunds Annual Report 2017, https://www.ftc.gov/system/files/documents/reports/bureau-consumer-protection-office-claims-refunds-annual-report-2017-consumer-refunds-effectedjuly/redressreportformatedforweb122117.pdf. There is no risk that an unnamed class member's claim would be lost through the operation of the law of preclusion. There is no risk, as in *Wal-Mart*, that the court would need to "reevaluate the roster of class members continually," *id.* at 364. Nor, in contrast to *Wal-Mart*, does this case present the problem of internal conflict within a class. *Id.* at 365. Instead, the restitution issue can be resolved in "one stroke." *Id.* at 350. In sum, nothing in *Wal-Mart* says that an injunction to turn over wrongfully acquired property

(here, in the form of money) to a government agency is in any way objectionable.

I next turn to the Supreme Court's decision in *Meghrig v. KFC Western, Inc.*, 516 U.S. 479 (1996), on which the majority relies so heavily. The issue in *Meghrig* was "whether § 7002 of the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. § 6972, authorizes a private cause of action to recover the prior cost of cleaning up toxic waste that does not, at the time of suit, continue to pose an endangerment to health or the environment." 516 U.S. at 481. In order to answer that question, the Court had to construe the citizen-suit provision of RCRA, 42 U.S.C. § 6972(a). It held that two requirements of section 6972 defeated plaintiff KFC's suit: first, the citizen-suit provision reaches only imminent and substantial harms, not past problems that have been addressed; and second, the remedial language focuses only on the restraint of ongoing clean-up and disposal problems, not on past clean-up costs ("whether [those] are denominated 'damages' or 'equitable restitution'"). 516 U.S. at 484.

This was a pure question of statutory interpretation. The relevant part of RCRA authorized a citizen suit "against any person … who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste *which may present an imminent and substantial endangerment to health or the environment*." 42 U.S.C. § 6972(a)(1)(B) (emphasis added). The Court gave that provision its natural reading—that is, as something that did *not* include a remedy for past cleanup costs. *Id.* at 485. It emphasized in that connection the importance of the imminence requirement, which entirely ruled out any form of relief, however labeled, for a fixed sum

representing past expenditures. Only in that context did the Court reject the argument that a plaintiff "could seek equitable restitution of money previously spent on cleanup efforts." *Id.* at 487. General rules about equitable powers were of no importance for a statute that drew the temporal line at problems that are "imminent and substantial." *Id.* Interestingly, the Court declined to rule on the question "whether a private party could seek to obtain an injunction requiring another party to pay cleanup costs which arise after a RCRA citizen suit has been properly commenced … ." *Id.* at 488. That reservation proves that the Court was not ruling out equitable turn-over of funds, period. It was simply saying that *past* expenditures were not covered by the statute in front of it.

So even *Meghrig* itself, a case involving private plaintiffs, did not purport categorically to exclude from injunctive relief an order to make payments. It is thus all the more remarkable that the majority interprets *Meghrig* to impose such a limitation on the relief that a *government* plaintiff can seek. As the majority acknowledges, "when 'the public interest is involved in a proceeding,' a court's 'equitable powers assume an even broader and more flexible character than when only a private controversy is at stake,'" *ante* at 38, quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946). But it then goes on to postulate that "the public interest doesn't turn on the identity of the parties involved." *Id.* That is not accurate. One factor informing the public interest is whether it is the government that is seeking relief. See, *e.g., Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7 (2008) (attaching great weight to Navy's interest in realistic training of sailors). The FTC's assessment of the public interest here informs the scope of any injunctive relief it is seeking.

The presence of the government as a litigant is especially important to the public-interest component of the analysis when the government seeks remedies that (1) lie uniquely within its toolbox and (2) are aimed squarely at undoing public harms and preventing future ones through deterrence. As the Second Circuit has noted in a section 13(b) case of its own (discussed in further detail below), this is precisely what the Commission seeks here by way of an injunction ordering equitable restitution in the form of disgorgement. "[D]isgorgement is a distinctly public-regarding remedy, available only to government entities seeking to enforce explicit statutory provisions." *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 372 (2d Cir. 2011) (affirming an injunction ordering "restitution" under 13(b) authority and discussing the theory underlying what the court understood to be equitable disgorgement).

The Supreme Court has explicitly recognized this feature of disgorgement in the SEC context. "SEC disgorgement is imposed by the courts as a consequence for violating what we described in *Meeker* as public laws. The violation for which the remedy is sought is committed against the United States rather than an aggrieved individual—this is why, for example, a securities-enforcement action may proceed even if victims do not support or are not parties to the prosecution." *Kokesh v. SEC*, 137 S. Ct. 1635 (2017). As the Court acknowledged in *Kokesh*, this understanding of disgorgement permeates the case law of our sister circuits as well. See *SEC v. Teo*, 746 F.3d 90, 102 (3d Cir. 2014) ("[T]he SEC pursues [disgorgement] independent of the claims of individual investors in order to promot[e] economic and social policies") (cleaned up); *SEC v. Rind*, 991 F.2d 1486, 1491 (9th Cir. 1993) ("[D]isgorgement actions further the Commission's public policy mission of protecting investors and safeguarding the integrity of the

markets"). Here, the FTC is seeking to vindicate the public interest through a public-facing remedy aimed at an ongoing harm. That was not the case in *Meghrig*, which was certainly *about* "environmental cleanup" but which rejected a backward-looking remedy that in economic substance sought damages.

The majority also asserts that cases decided since *Meghrig* demonstrate that it represented a sweeping rejection of implied remedies. *Ante* at 33. It cites *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002); *Miller v. French*, 530 U.S. 327 (2000); *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015), and *Gebser v. Lago Vista Ind. Schl. Dist.*, 524 U.S. 274 (1998), for this proposition. None of those cases, however, addresses the situation before us: a governmental plaintiff with an express right of action, and an agency that seeks an injunction (also expressly authorized) ordering a wrongdoer to disgorge ill-gotten gains.

*Great-West* was brought by a private party under the Employment Retirement Income Security Act (ERISA) to compel a plan beneficiary to pay over money recovered from a third-party tortfeasor to the plan. The Supreme Court held that the petitioners essentially wanted "to impose personal liability on respondents for a contractual obligation to pay money—relief that was not typically available in equity." *Id.* at 210. That took their request beyond the bounds of equitable relief; as the Court put it, "an injunction to compel the payment of money past due under a contract was not typically available in equity." *Id.* There is not a hint of contract law in our case, and so *Great-West* is not applicable. *Miller* is equally beside the point. There, Congress had acted explicitly to limit the equitable power of the district courts to enjoin the automatic stay

provided by the Prison Litigation Reform Act. 530 U.S. at 331. The Supreme Court held that the statute did not permit district courts to override that provision with a "stay of the stay," which is what the private litigants sought. No such effort to undo a congressional prohibition exists in our case. *Armstrong* and *Gebser* are even further afield. *Armstrong* holds only that neither the Supremacy Clause (Art. VI, cl. 2 of the Constitution) nor the Medicaid Act confers a private right of action on providers of rehabilitation services, whether for injunctive relief or anything else. *Gebser* actually does recognize a limited implied private right of action for sexual harassment of schoolchildren. In short, nothing in *Meghrig*, and nothing in the cases following *Meghrig*, comes close to holding that a government agency acting pursuant to express authority to seek injunctive relief cannot ask for a mandatory injunction requiring turn-over of money.

Given our decision to cast off a precedent that has guided both this court and other courts of appeals for decades, I add a word about our now-abandoned decision in *Amy Travel*, which held that the FTC is authorized to obtain restitution as part of the injunctive relief covered by section 13(b). I already have explained why I believe that ruling to be correct. My comments here address the majority's effort to trivialize the fact that eight of our sister circuits agree with *Amy Travel*'s holding. They brush off this consensus with the accusation that these courts have done so unthinkingly.

I find that charge quite unwarranted. In the interest of space, I focus on only one of those other cases: the Second Circuit's opinion in *Bronson*, 654 F.3d 359 (Lynch, J.). There, the FTC brought suit for an injunction against Bronson for engaging in deceptive advertising of weight-loss products. The

district court "entered a permanent injunction against Bronson and ordered it to pay $1,942,325 in monetary equitable relief plus statutory interest." *Id.* at 362. Bronson argued, just as Brown and Credit Bureau have here, that section 13(b) did not permit a court to order monetary relief. The Second Circuit rejected that argument, along with the narrower point that traceability of the ill-gotten gains was essential. But it did so only after a thorough and thoughtful consideration of Bronson's argument.

After first noting that section 13(b) of the FTC Act permits the FTC to seek permanent injunctive relief, the Second Circuit noted that "courts have consistently held that 'the unqualified grant of statutory authority to issue an injunction under [S]ection 13(b) carries with it the full range of equitable remedies, including the power to grant consumer redress and compel disgorgement of profits.'" 654 F.3d at 365. The Second Circuit explicitly joined that consensus, holding that section 13(b) of the FTC Act permits courts to grant ancillary equitable relief, including equitable monetary relief. *Id.*

The court then turned to the argument that any kind of monetary award would be "an impermissible legal, rather than equitable, award, because the [district] court failed to identify particular funds in the defendants' hands that were specifically traceable to the fraudulently marketed products." *Id.* at 369. After a lengthy and scholarly discussion of the law of restitution, the Second Circuit concluded that the disgorgement ordered in the case before it was a permissible adjunct to the injunctive relief authorized by section 13(b). This was so because "the district court's award satisfies the requirements of equitable disgorgement … ." *Id.* at 370.

The court went on to confirm that "disgorgement is a well-established remedy in the Second Circuit," often used in actions under section 21(e) of the Securities Exchange Act of 1934. That statute, which "authorizes an action to enjoin violations of the securities laws, also permits the district court to award disgorgement as an equitable adjunct to its injunctive decree." *Id.* at 372. Importantly, "disgorgement—at least when sought by public agencies such as the SEC and the FTC—has several features that make it distinct from the remedies available to private litigants seeking to press common law claims." *Id.* That is because "disgorgement is a distinctly public-regarding remedy, available only to government entities seeking to enforce explicit statutory provisions." *Id.* That feature also plays a significant role in the case before us.

The Second Circuit also took note of another distinction that I, too have stressed: "public entities [are not] required to make any particular effort to compensate the victims that they *can* identify," because the victim is the government, not the individual persons. *Id.* at 373. It added, "While agencies may, as a matter of grace, attempt to return as much of the disgorgement proceeds as possible, the remedy is not, strictly speaking, restitutionary at all, in that the award runs in favor of the Treasury, not of the victims." *Id.* In my view, this point underscores why the restitutionary payment bears no resemblance to individual money damages to the injured parties.

Whatever else one might want to say about the Second Circuit's analysis in *Bronson*, it is surely impossible to characterize it as a drive-by ruling or one that was not carefully considered and thoroughly explained. I find it quite persuasive. It demonstrates to me why both we and our sister circuits up

until this time have understood that the injunctions authorized by section 13(b) can include a restitutionary component.

Finally, I want to emphasize that even if we were interpreting this statute on a blank slate, rather than upending decades of precedent and creating a split with eight other circuits, the majority's reading of section 13(b) is still not persuasive. The majority grounds its argument in the contrast between the injunctive relief explicitly authorized in section 13(b) and the remedies available to the agency if it opts to use its cease-and-desist powers under section 5 of the FTC Act or to punish violators of promulgated rules under section 19. (Section 5 of the Act is codified at 15 U.S.C. § 45, while section 19 is codified at 15 U.S.C. § 57b. The majority uses the U.S. Code cites for sections *other* than 13(b); my analysis below uses the same scheme for ease of cross-reference with the majority's opinion.)

As the majority sees things, we must read 13(b)'s grant of injunctive authority extremely narrowly given that section 57b(b) specifically mentions "the refund of money or return of property" as a form of relief the court can order, and 45(*l*) allows courts to "grant mandatory injunctions and such other and further equitable relief as they deem appropriate." I do not quibble with the overarching principle that "it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion [of words in different sections of the same Act]." *Nken v. Holder*, 556 U.S. 418, 430 (2009) (quotation marks omitted). But a close look at the two contrasting sections reveals that this is not a straightforward case of a list comprised of "A, B, and C" and another consisting of only "A and B."

I begin with section 57b(b), which lays out remedies for violations of final rules. Our first clue that this subsection should not be read to limit the scope of injunctive relief in a 13(b) action is that courts are directed in 57b(b) to "grant such relief as the court finds necessary to *redress injury* to consumers or other persons, partnerships, and corporations…" (emphasis added). These are largely backward-facing remedies. As discussed above, courts have long recognized that disgorgement of ill-gotten gains—the sort of equitable restitution at issue here—is a forward-looking remedy aimed at deterrence. Making consumers whole is a possible, but not inevitable, consequence of a disgorgement order. "[T]he primary purpose of disgorgement orders is to deter violations of the [] laws by depriving violators of their ill-gotten gains." *Bronson*, 654 F.3d at 737, quoting *SEC v. Fishbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997). (Notably, section 57b(b) actually *prohibits* courts from imposing "any exemplary or punitive damages.") Second, while section 57b(b) lists some more forward-looking remedies, such as "public notification respecting the rule violation or the unfair or deceptive act or practice," this language only highlights how strained it is to read section 57b(b) as a limitation on courts' 13(b) injunctive authority. Would a court issuing a 13(b) injunction be powerless to order a violator to post "public notification respecting the … unfair or deceptive act or practice," simply because this remedy is listed in another subsection? Surely not.

It is also important to recall that the list in 57b(b) is merely illustrative: courts are authorized to order relief that "may include, but shall not be limited to," the listed remedies. This subsection is thus a poor candidate (at best) for the *expressio unius* canon. (Compare "Visitors may bring pets into the park on weekdays" with "Animals that visitors are permitted to

bring into the park on weekends may include, but shall not be limited to, dogs, cats, snakes, monkeys, and alligators." Could weekday visitors not bring dogs?) The savings clause in the same section is the *coup de grâce* for the majority's reasoning. It cautions that "Remedies provided in this section are in addition to, and not in lieu of, any other remedy or right of action provided by State or Federal law. *Nothing in this section shall be construed to affect any authority of the Commission under any other provision of law.*" *Id.* § 57b(e) (emphasis added). That says it all: the non-exhaustive examples of relief Congress chose to mention in one section do not limit what a court may or may not include pursuant to another section—for instance, a 13(b) injunction.

The list of remedies available to the FTC in a cease-and-desist action, spelled out in section 45(*l*), also provides little help for the majority. True, this section authorizes the FTC to "grant mandatory injunctions and such other and further equitable relief as they deem appropriate …" But so what? Some forms of equitable relief make sense as standalone remedies, injunction or no injunction. In contrast, equitable remedies are available under 13(b) only if (1) a plaintiff satisfies the demanding burden of demonstrating why an injunction should issue, see *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006); and (2) the court is able to justify the relief it is ordering as a proper adjunct to the injunctive decree. By allowing courts to issue "such other and further equitable relief," section 45(*l*) clarifies that courts have a wide range of equitable relief available to them, no matter whether plaintiffs managed to obtain an injunction or, if an injunction has issued, whether the remedies are appropriate means of enforcing the decree. Under 45(*l*), a court could order an accounting or some sort of

specific performance whether or not the requirements for a mandatory injunction had been satisfied.

There are further weaknesses in the majority's reading of the statute, but I have said enough to show that its approach is far from the most straightforward even if we did not have decades of precedent, eight other circuits, and *American Stores* on the other side. The FTC Act spells out a finely crafted system of enforcement powers and remedies. The majority's interpretation upends what the agency and Congress have understood to be the status quo for thirty years, and in so doing grants a needless measure of impunity to brazen scammers like the defendant in this case.

I end where I began: This is an important case, and it deserves plenary consideration, not the truncated process that Rule 40(e) provides for appropriate cases. The court's refusal to rehear this case *en banc* has, I fear, led us into error. I therefore dissent from the decision not to give this case plenary *en banc* consideration.